UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
PAULINE PIPITONE, as the Administrator of
the Estate of NICHOLAS GUIDO, Deceased, and
PAULINE PIPITONE, Individually,

                        Plaintiffs,

           -against-

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------------x
FRANCES BISHOP, as the Administrator of
the Estate of JAMES BISHOP, Deceased, and
FRANCES BISHOP, Individually,

                        Plaintiffs,

           -against-

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------------x
SUSAN BORIELLO, as the Administrator of
the Estate of BARTHOLEMEW BORIELLO,
Deceased, and SUSAN BORIELLO, Individually,

                        Plaintiffs,

           -against-

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**

06-CV-145 (RJD) (JMA)

06-CV-2843 (RJD) (JMA)

06-CV-2954 (RJD) (JMA)

```
----------------------------------------------------------x
MARY ANN DI LAPI and SALVADOR DI LAPI,
as the Proposed Administrators of the Estate of
ANTHONY DI LAPI, Deceased, and MARY ANN
DI LAPI and SALVADOR DI LAPI, Individually,

                        Plaintiffs,

            -against-
                                                    06-CV-3101 (RJD) (JMA)

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------x
RACHAEL LEAH GREENWALD, as the
Administrator of the Estate of ISRAEL GREENWALD,
Deceased, and RACHAEL LEAH GREENWALD,
MICHAL GREENWALD, and YAEL GREENWALD,
Individually,

                        Plaintiffs,

            -against-
                                                    06-CV-2864 (RJD) (JMA)

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------x
ANNA LINO, as the Administrator of the Estate of
EDWARD LINO, Deceased,

                        Plaintiff,

            -against-
                                                    06-CV-3591 (RJD) (JMA)

THE CITY OF NEW YORK, et al.,

                        Defendants.
----------------------------------------------------------x
```

2

```
-------------------------------------------------------------x
```
TINA MORRIS, as the Administrator of the Estate
of JOHN OTTO HEINDEL, Deceased, and TINA
MORRIS, Individually,

                            Plaintiffs,

           -against-

                                  07-CV-2189 (RJD) (JMA)

THE CITY OF NEW YORK, et al.,

                          Defendants.
```
-------------------------------------------------------------x
```
DEARIE, District Judge

       In the 1980s and early 1990s, two senior NYPD detectives—Louis Eppolito and Steven

Caracappa—committed a series of murders on behalf of organized crime.  They also leaked

police information that led directly to several additional murders.  Both men have since been

convicted of federal criminal charges.  <u>See</u> <u>United States v. Eppolito</u>, 543 F.3d 25 (2d Cir. 2008).

In these consolidated civil cases, the relatives of seven victims seek redress from Eppolito,

Caracappa, and New York City pursuant to § 1983 and various state laws.  The gravamen of the

claims against the City is the NYPD's inexplicable failure to discipline Eppolito in 1985, when

he was caught red-handed passing confidential police documents to Rosario Gambino.

       The City now moves for summary judgment.  The <u>Di Lapi</u> plaintiffs cross-move for

summary judgment on their state law respondeat superior claim.  Given the decades that have

passed since the murders, the Court is called upon to address the timeliness of the claims in

addition to substantive issues of municipal liability.  For the reasons set forth below, the City's

motion for summary judgment is denied as to the federal claims but granted as to the state law claims. The motion brought by the <u>Di Lapi</u> plaintiffs is denied.[1]

BACKGROUND

The following narrative, drawn from the parties' Rule 56.1 statements and the exhibits proffered in support of those statements, sets forth the relevant background. Most of the facts are not in dispute, but the record is construed in the light most favorable to the plaintiffs.[2]

A.    <u>The Gambino Documents</u>

Eppolito and Caracappa joined the NYPD in 1969.[3] D ¶¶ 308, 330.[4] By the early 1980s, both were detectives. D ¶¶ 312, 346. Eppolito was assigned to the detective squad in the 62nd precinct. D ¶ 314. Caracappa was assigned to the Major Case Squad, an elite unit with citywide authority to investigate significant criminal activity, including organized crime. D ¶¶ 349-52.

In April 1984, the FBI discovered thirty-six confidential NYPD Intelligence Division reports at the home of Rosario Gambino, a mobster who was under indictment for heroin trafficking. D ¶ 355, P ¶ 21. The reports included diagrams of family trees, surveillance reports, and the criminal records of reputed organized crime figures. Ex. 26 at 4 n.2. NYPD Internal

---

[1]    Because the Court's ruling does not rest upon the evidence provided by the plaintiffs' police practices expert, Russell Fischer, the Court does not now decide the City's motion to preclude Fischer's testimony. <u>See</u> ECF No. 155. That motion remains in abeyance pending the parties' pre-trial submissions.

[2]    In analyzing the <u>Di Lapi</u> plaintiffs' summary judgment motion, the Court views the record in the light most favorable to the City. Because the bulk of this Memorandum addresses the City's summary judgment motion, however, this Background section describes the record in the light most favorable to the plaintiffs.

[3]    Eppolito's father (known as Fat the Gangster) and uncle (known as Jimmy the Clam) were associated with New York organized crime families. P ¶ 205.

[4]    The Court abbreviates the City's Rule 56.1 Statement of Material Facts, ECF No. 168, as "D" and the Plaintiffs' Rule 56.1 Counterstatement of Additional Material Facts, ECF No. 171, as "P."

Affairs investigators interviewed Detective Sweeney from the Intelligence Division, who told

them that he had given the Gambino documents to Eppolito because Eppolito requested them for

the 62nd precinct's files.  P ¶ 26.  The investigators also interviewed Eppolito's supervisors, who

denied having given him permission to go to the Intelligence Division.  The sign-in logs at the

Intelligence Division showed that Eppolito had visited the Intelligence Divsion once in the

previous two years (on December 13, 1983) and that he was unaccompanied.  P ¶¶ 28, 42.

The FBI and NYPD Internal Affairs determined that the reports found in Gambino's

home were photocopies that had been made on the 62nd precinct's photocopier.  P ¶ 27.  They

also found Eppolito's fingerprints on the photocopies.  Because fingerprints cannot be

photocopied, <u>see</u> P ¶ 35, the presence of Eppolito's fingerprints on the documents found in

Gambino's home provided compelling evidence that Eppolito had made the copies and leaked

them to Gambino.  Despite this evidence, the Office of the State Special Prosecutor ("OSSP"),

the entity responsible for prosecuting officers accused of misconduct, declined to initiate

criminal proceedings against Eppolito.  D ¶ 368.

In November 1984, Internal Affairs investigators questioned Eppolito under oath in a

General Order 15 ("GO 15") interview.[5]  P ¶ 29.  Eppolito told the investigators that his

supervisors had given him permission to go to the Intelligence Division to show photographs to a

witness in the Alberto Veriale murder investigation.  P ¶ 41.  This statement was contradicted by

the statements given by Eppolito's supervisors and by the witness logs, which showed that

Eppolito was alone when he visited the Intelligence Division.  Eppolito also told the

investigators that Sweeney had asked him to take the Gambino reports to help the Intelligence

Division locate Gambino.  P ¶ 37.  This statement was contradicted by Sweeney's account.

---

[5]     According to the City, police officers receive immunity for GO 15 testimony.  City
Reply, ECF No. 175 at 46.

Finally, Eppolito denied making copies of the documents and said that he had not touched them since the day he took them from the Intelligence Division.  P ¶ 30-43.  These statements, of course, were contradicted by the presence of Eppolito's fingerprints on the ***photocopies*** found in Gambino's home.

B.    The Disciplinary Hearing

Based on the fingerprint evidence and the obvious discrepancies between Eppolito's GO 15 interview and the statements of his supervisors and Detective Sweeney, Internal Affairs concluded that there was sufficient proof to refer the matter to the Department Advocate's Office, which is responsible for filing and trying disciplinary cases against police officers.  P ¶¶ 51-52, 60; D ¶¶ 382-83.  The Department Advocate's Office brought formal charges against Eppolito, and he was suspended without pay on November 27, 1984.  P ¶¶ 13, 55.

The allegations against Eppolito received front page attention in the New York Times and the New York Daily News and were covered by several other news organizations.  P ¶¶ 6-7, 56-57.  This was the first major scandal of NYPD Commissioner Ben Ward's tenure.  For obvious reasons, it was the talk of the department.  P ¶ 9.  Caracappa was the first to alert Eppolito to the news reports and had coffee with Eppolito nearly every day while he was suspended.  P ¶ 211.

The disciplinary hearing was held on April 4, 1985 before Deputy Trial Commissioner Hugh Mo.  These hearings were ordinarily conducted along the lines of a bench trial: the parties submitted evidence, examined and cross-examined witnesses, and made closing statements to the court.  P ¶ 61.  The Eppolito hearing, however, was highly unusual—particularly given the gravity of the charges.

First off, the case was tried by a junior lawyer, Sergeant William Medican. High-profile matters like the allegations against Eppolito were typically handled by senior attorneys. According to Mo, a supervisor should have been "intimately involved" in a case involving the potential termination of a police officer. P ¶ 130. Yet there were no senior attorneys present at the hearing to oversee or guide Medican. P ¶ 132.

Also unusual was the Department Advocate's Office's decision, on the morning of the hearing, to try the case on stipulations rather than introduce live testimony. The transcript of the hearing suggests that the parties agreed to the stipulations at an off-the-record bench conference with Deputy Trial Commissioner Mo immediately before the hearing. P ¶ 72; see also Ex. SSSS (disciplinary hearing transcript). The strange nature of this decision is evident from Mo's statements at his deposition: he did not recall the off-the-record conference, and instead was confident that he "would not have walked into the trial room on the same day in which the parties announced that the evidence will be stipulated." P ¶ 72.

Medican, as a junior attorney, lacked authority to enter into evidentiary stipulations on his own. They had to have been approved by his supervisor. P ¶¶ 74-75. At the time, Medican's supervisors were John Walsh and William Flack. Yet Walsh and Flack each stated, at their respective depositions, that the other was responsible for the Eppolito matter. P ¶¶ 121-23. Neither Flack nor Walsh nor Medican nor Mo were able to recall why the Department Advocate's Office agreed to try the case on stipulations. P ¶¶ 118-29.

While the circumstances of the decision to try the case on stipulations remain murky, it is abundantly clear that trying disciplinary charges of such gravity on stipulations was well outside the normal course of business. The Internal Affairs investigator responsible for the case and his supervisor both expected the hearing to proceed in the normal manner. Indeed, the investigator

sat outside the hearing room during the hearing, waiting to be called as a witness.  P ¶¶ 76-78.

At his deposition, Medican testified that the Eppolito matter was the only case in his thirty-year

legal career that was conducted solely on stipulated facts.  P ¶ 70.  While the parties dispute

whether holding a trial on stipulations was "unprecedented," the City concedes that "stipulated

trials weren't ordinary."  City Resp. to Pl.'s Rule 56.1 Counterstatement of Add'l Material Facts,

ECF No. 178 ¶ 72[e]; see also P ¶¶ 70-78.

Even more perplexing—indeed, startling—is the fact that the stipulations omitted much

of the evidence against Eppolito, including the crucial detail that the documents found in

Gambino's house were photocopies made in the 62nd precinct, rather than the originals that

Eppolito had picked up from the Intelligence Division.  D ¶ 390.  The presence of Eppolito's

fingerprints on these photocopies (as opposed to the originals) all but foreclosed the possibility

that a third party had illicitly accessed the Intelligence Division materials and given them to

Gambino.  According to Walsh, the presence of Eppolito's fingerprints on the photocopies from

the 62nd precinct was "overwhelming" evidence of Eppolito's guilt.  P ¶ 83-84.  And the fact that

the documents were photocopies directly contradicted Eppolito's sworn statement that he did not

make any photocopies.  P ¶¶ 81-84.  Yet the vital fact that the documents that bore Eppolito's

fingerprints were photocopies from the 62nd precinct was absent from the stipulations.

The stipulations also ignored the other significant discrepancies between Eppolito's

testimony and the statements of other police officers.  They did not reflect that Eppolito and

Detective Sweeney gave contradictory accounts of how Eppolito acquired the documents from

the Intelligence Division.  They did not indicate that Eppolito's supervisors denied having given

him permission to go to the Intelligence Division.  Nor did they reflect the contradiction between

Eppolito's sworn statement that a witness accompanied him to the Intelligence Division and the

sign-in logs showing that he was alone. P ¶¶ 86-101; D ¶ 391; see generally Ex. SSSS.[6] As

Walsh himself stated at his deposition, these discrepancies would have been important at trial.

P ¶ 107. It is hard to imagine why they were not introduced into the record.

And finally, at the conclusion of the hearing, Eppolito's lawyer gave a summation that

misstated the evidence in several respects. He argued that Eppolito had "rightfully received" the

reports from Sweeney, that there was no evidence to bridge the gap between Eppolito placing the

reports in the 62nd precinct file and their receipt by Gambino, and that it was possible that the

Gambino documents came straight from the Intelligence Division itself. Ex. SSSS at 23-25. All

three propositions were contradicted by Sweeney's sworn statements and forensic evidence that

the Gambino documents bearing Eppolito's fingerprints were photocopies made in the 62nd

precinct. Yet Medican made no attempt to set the record straight. In fact, Medican did not make

any closing argument or summation. In Walsh's judgment—as seems plain as a matter of

common sense—Medican should have made closing remarks. P ¶ 133.

After Medican declined to make a closing argument, Mo immediately announced from

the bench that he would recommend to Commissioner Ward that Eppolito be cleared because "it

is crystal clear . . . that the Department has failed to substantiate [its] burden of proof." Ex. SSSS

at 27. Mo reached this decision without having reviewed the transcript of Eppolito's GO 15

interview. D ¶ 389; P ¶¶ 108, 138. He noted on the record it was his "understanding that the

Department Advocate w[ould] submit to the Court" the transcript and tape of the GO 15

interview. Ex. SSSS at 32. At the end of the hearing, Mo explained that he was "very much

---

[6]      The stipulations also indicated that Eppolito went to the Intelligence Division in
connection with the Hunt murder investigation, rather than the Veriale investigation that
Eppolito described in the GO 15 interview. P ¶¶ 98-101.

impressed with the presence" of the president of the Detectives Endowment Association, which he viewed as an expression of support for Eppolito. Ex. SSSS at 31.

C.  Commissioner Ward Clears Eppolito

Five days later, on April 10, 1984, Mo issued a written recommendation to Ward that Eppolito be adjudged not guilty, reimbursed for pay and benefits, and restored to duty.[7] P ¶ 139. Though Mo stated at his deposition that he had carefully reviewed the GO 15 transcript by the time he issued his written recommendation to Ward (as demanded by NYPD policy), he did not note any of the contradictions between Eppolito's GO 15 testimony and the contents of the stipulations. P ¶ 109; see also Ex. 26. In addition to his written recommendation, Mo submitted the transcript of the hearing and the hearing exhibits to Ward, as well as the transcript of Eppolito's GO 15 interview. P ¶ 142.

As Commissioner, Ward had the authority to overturn Mo's findings, order additional investigation, or modify the result, and had done so in previous disciplinary matters. P ¶ 141. He was an attorney and had extensive experience with the disciplinary process prior to becoming Commissioner. P ¶ 2. He had served in the Department Advocate's Office and tried disciplinary cases. He had also presided over disciplinary hearings as a Deputy Trials Commissioner. P ¶ 3. Despite this wealth of experience, which presumably would have alerted Ward to the strange nature of the hearing—particularly the absence of live testimony, the inexperienced Department Advocate, and the lack of closing arguments—he approved Mo's recommendation on April 11, the day after he received it.

---

[7]  Mo's report to Commissioner Ward states that Eppolito and the department had stipulated "that the [Intelligence Division reports] are either the actual documents which Sweeney gave to the Respondent, or duplicates of those records." Ex. 26 at 4. As described above, the FBI had concluded that the reports found in Gambino's home were photocopies made in the 62nd precinct, not the actual documents that Sweeney had given to Eppolito at the Intelligence Division.

Several days later, the New York Daily News quoted Mo as stating that Eppolito was "completely cleared" and "epitomizes the finest of the Department and is the unfortunate victim of circumstance." The plaintiffs contend that these comments violated department policy on press statements. P ¶ 158.

Chief of Detectives Richard Nicastro believed, at the time, that Eppolito had leaked the documents and should have been disciplined. Nicastro did not want to take Eppolito back into the detective bureau, but was told by Commissioner Ward's office that he was required to do so. P ¶ 156. Eppolito was reassigned from the 62nd precinct to the neighboring 63rd precinct, which was also known for organized crime activity. P ¶ 157.

Internal Affairs conducted a follow-up investigation after the disciplinary hearing and again concluded that Eppolito had leaked the intelligence reports to Gambino. P ¶ 166. According to Walsh, the existence of a memo describing the follow-up investigation would have been noted on Eppolito's personnel file as a "red flag." Given the notation in the personnel file, Internal Affairs should have been consulted when Eppolito was up for promotion. P ¶ 167.

In September 1987, Eppolito wrote to Commissioner Ward requesting an out-of-turn promotion to Detective Second Grade as compensation for the suffering he underwent as a result of the Gambino investigation. That letter misstated the hearing transcript and alleged, falsely, that Flack had informed the head of Internal Affairs after the hearing that there had been "no case" against Eppolito. P ¶¶ 168-73. The promotion was approved. At his deposition in this case, an Internal Affairs investigator characterized Eppolito's promotion as "a slap in the face" to Internal Affairs. P ¶ 178.

D.    The Mollen Commission Report on NYPD Corruption

In July 1992, Mayor Dinkins created the Mollen Commission to examine corruption within the NYPD.  P ¶ 180.  The Mollen Commission revealed serious issues with the NYPD's anti-corruption attitudes and policies.  See generally Ex. 39.  According to the Commission's 1994 report, over the preceding decade the NYPD had "largely abandoned its responsibility to police itself."  P ¶ 184.  "[A] message had filtered down from top commanders, including the police commissioner, that disclosure of corruption, even that resulting from vigilant corruption fighting, would be viewed as a management failure."  P ¶ 191.  "From the top brass down," the report concluded, "there was a widespread belief that uncovering serious corruption would harm careers and the department's reputation.  As a result, avoiding bad headlines, and tolerating corruption, became more important than eradicating it."  P ¶ 185.  "This abandonment of anti-corruption efforts did more than avoid public exposure of corruption, it fueled it. . . . In short, it gave everyone in the Department an excuse for doing what was easiest: shutting their eyes to corruption around them."  P ¶ 194.  The Commission's findings were later endorsed by Mayor Giuliani and the Speaker of the City Council.  P ¶ 182.

E.    The Murders

After he was cleared of the Gambino charges, Eppolito initiated a relationship with the Lucchese crime family.  Eppolito's cousin, Frank Santoro, contacted Burton Kaplan, a Brooklyn mobster who worked for Lucchese underboss Anthony "Gaspipe" Casso.  Santoro told Kaplan that his cousin Eppolito was a police officer who could provide police information to the Luccheses or even help Kaplan "if he had any problems physically."  Ex. NNN at 515.  Santoro also relayed that Eppolito's partner, Caracappa, had an important job at the police department that could be useful to Kaplan.  Caracappa was a member of the Major Case Squad, was

specifically assigned to the Lucchese unit, and often worked on task forces that included both local detectives and federal agents. He thus had access to a great deal of confidential information about ongoing investigations. D ¶ 351-52; see also Eppolito, 543 F.3d at 28.

In February 1986, Kaplan hired Eppolito and Caracappa to murder Israel Greenwald, a jeweler whom Kaplan suspected was planning to cooperate with a police investigation. Eppolito, Caracappa, and Santoro followed Greenwald's car on the highway and pulled him over using flashing lights. They told Greenwald that he was a suspect in a hit-and-run investigation and that they needed to take him to the station for a line-up. Instead of taking Greenwald to the station, they murdered him in a Brooklyn garage. Greenwald's car was found at JFK Airport several weeks after his death, and his body was eventually recovered from the garage in April 2005. D ¶ 272-83. Kaplan paid Eppolito, Caracappa, and Santoro $30,000 for the murder. Eppolito, 543 F.3d at 29.

In September 1986, Casso escaped an assassination attempt by rival mobsters. Eppolito was assigned to the NYPD investigation. Using Santoro and Kaplan as intermediaries, Eppolito passed the investigative file to Casso, including information that identified Nicky Guido as a suspect. Eppolito told Casso, through Kaplan, that he would provide Guido's address for $4,000. Considering this request "greedy," Casso used his own sources to locate Guido. On December 25, 1986, Guido was murdered. Casso, however, had the wrong address. The Nicky Guido who was murdered, and whose mother is a plaintiff, was not the same Nicky Guido that the NYPD had identified as a suspect. P ¶¶ 223-25; see also Eppolito, 543 F.3d at 30.

The relationship between the detectives and the Luccheses continued after Santoro was killed in 1987. Eppolito began to deal directly with Kaplan. Casso, through Kaplan, paid Eppolito and Caracappa a $4,000 monthly retainer in exchange for providing law enforcement

information.  They were paid extra for murder contracts.  P ¶¶ 226-27; see also Eppolito, 543 F.3d at 30-31.

In 1987, Kaplan asked Eppolito to determine whether Lucchese associate John Otto Heindel was cooperating with law enforcement.  Eppolito, perhaps with help from Caracappa, learned that Heindel was a cooperator, and Casso had him killed on October 8, 1987.  The parties dispute whether Eppolito had access to information that Heindel was an informant, or whether he had access to that information only through Caracappa.  At any rate, Eppolito was assigned to the murder investigation.  During a search of Heindel's apartment, Eppolito found tapes that confirmed that Heindel was an FBI cooperator and gave them to Kaplan.[8]  P ¶ 229; see also Eppolito, 543 F.3d at 32.

Eppolito turned in his badge and went on terminal leave from the police force in December 1989.  He formally retired in February 1990.  D ¶¶ 317-21.  Caracappa, however, remained on the Major Case Squad until his retirement in November 1992.  D ¶¶ 352-53.

In late 1989 or early 1990, Kaplan contacted Caracappa directly to ask for information about the whereabouts of Anthony Di Lapi.  Di Lapi was a Lucchese soldier who had fled to California rather than provide Casso, who had gained power within the family, with an accounting of his book-making operation.  Caracappa was able to get Di Lapi's address from his probation officer in California.  Di Lapi recognized a member of a hit team that Casso had dispatched to Los Angeles and moved to a new location, but Caracappa was able to obtain the new address from the probation officer.  This time, the hit was successful: Di Lapi was murdered

---

[8]      Several months before his death, Heindel told his daughter (who is a plaintiff) that he feared for his life because "two crooked cops" were harassing him for money and information and had threatened to expose him as a cooperator.  D ¶¶ 135-41.  A 1990 article in the Long Island Newsday reported that Heindel was killed because the Luccheses believed he was cooperating with the authorities.  D ¶ 147-48.

in the garage of his apartment building in February 1990.[9]  P ¶ 231; see also Eppolito, 543 F.3d at 32.

In early 1990, either Eppolito or Caracappa—Kaplan was not sure which—informed Kaplan that James Bishop, a high-ranking official in the painter's union who had detailed knowledge of mob connections in the industry, was cooperating with investigators.  Bishop was killed several weeks later, on May 17, 1990.[10]  P ¶ 232; D ¶¶ 178-92.

Throughout the late 1980s and early 1990s, Casso continued to seek revenge against individuals that he suspected were involved in the 1986 attempt on his life.  One of these suspects was Eddie Lino, a captain in the Gambino organization.[11]  On Casso's orders, Eppolito and Caracappa pulled Lino over on the Belt Parkway in Brooklyn on November 6, 1990.  Eppolito distracted Lino while Caracappa shot and killed him.  The detectives received $70,000 for the job.  P ¶ 230; see also Eppolito, 543 F.3d at 32-33.

---

[9]    Several months before his murder, Di Lapi told his son Salvatore, a plaintiff in this matter, that if he was killed, "the cops were responsible."  D ¶ 168.  Di Lapi's son told his sister, Mary Ann, who is also a plaintiff, about this comment.  D ¶ 171.  When Mary Ann Di Lapi learned, at some point in the 1990s, that Casso had police officers working for him, she "made a connection" between this information and her father's comment that if anything happened to him, the cops were responsible.  D ¶ 175.

[10]    Bishop's murder was covered in the newspapers, but none of the articles mentioned Eppolito or Caracappa.  One article, published in the Dallas Morning News, describes a rumor that Victor Amuso, the head of the Lucchese organization, identified Bishop as a cooperator through his "crystal ball," a "top-secret law enforcement source."  D ¶¶ 187-90.

[11]    In October 1986, Eppolito and Caracappa kidnapped Jimmy Hydell (another suspect identified by Eppolito) and delivered him to Casso in the trunk of a car in a Toys R Us parking lot.  Under torture, Hydell implicated Lino and other members in the Gambino family in the hit attempt.  After eliciting this information, Casso killed Hydell.  Eppolito, 543 F.3d at 29-30, 32.

Casso also suspected that Bobby Boriello, another senior figure in the Gambino organization, had been involved in the 1986 assassination attempt.[12] In 1986, he tasked Eppolito and Caracappa with murdering Boriello. The attempt was foiled when another police officer spotted the two men shadowing Boriello outside of a social club in Brooklyn. They decided that the attempt was too risky. Five years later, in 1991, Kaplan asked Caracappa to get a new address for Boriello. Caracappa did so. Shortly thereafter, in April 1991, Boriello was murdered in his driveway.[13] P ¶ 233; D ¶ 237-39.

F.    Media Coverage and Convictions

Casso was indicted in 1990, but escaped arrest thanks to a tip from Eppolito and Caracappa. He was finally captured in 1993. P ¶ 234. In March 1994, Casso began to cooperate with federal investigators. Reports that Eppolito and Caracappa had murdered Eddie Lino and acted as spies for Casso received front page coverage in New York newspapers from March to June 1994. D ¶¶ 33-48; see generally Ex. HHHH (newspaper articles). Caracappa and Eppolito vehemently denied the allegations. See Ex. HHHH. Several of these articles accused Casso of murdering Guido and Boriello, but did not suggest that those murders were linked to Eppolito, Caracappa, or the NYPD.

---

[12]    Eppolito apparently provided Kaplan with a tape recording of Boriello lamenting that Casso had survived the hit. Ex. NNN at 757. The parties do not mention this incident, which Kaplan described in his testimony at the criminal trial, in their Rule 56.1 statements.

[13]    Boriello's wife, a plaintiff, testified at her deposition that she believed at the time that the police were involved in her husband's murder because the police cars that were usually parked outside her house were not there on the day he was killed. D ¶ 231-32. She also testified that a man who she later recognized as Eppolito came to her house in March 1991, identified himself as a cop (though Eppolito would have been retired at that point), and asked if Bobby Boriello lived there. And the day after the murder, Caracappa came to her house, claimed to be running the investigation, and questioned her about what she had witnessed. D ¶¶ 242-52.

The investigation into Eppolito and Caracappa foundered until early 2005, when Kaplan agreed to cooperate with federal authorities. Based on evidence from Kaplan, federal prosecutors indicted Eppolito and Caracappa on March 9, 2005. These consolidated civil cases were filed between January 2006 and May 2007. Eppolito and Caracappa were convicted in April 2006 and their convictions were affirmed by the Second Circuit in 2008. D ¶ 59; Eppolito, 543 F.3d 25.

ANALYSIS

Summary judgment is appropriate if there is "no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006). "In deciding whether there is a genuine issue of material fact, [this Court] must interpret all ambiguities and draw all factual inferences in favor of the nonmoving party." Id. "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).

A.   Federal Claims

   1.   Timeliness

The murders that give rise to these lawsuits occurred nearly three decades ago, as did the disciplinary proceedings that cleared Eppolito of the Gambino charges. Accordingly, the first issue that the Court must resolve is the timeliness of the claims. Underlying the legal analysis is the inevitable tension, in cases involving events of this vintage, between the interests of redress and accountability and the practical demands of certainty and repose. Cf. R.R. Telegraphers v. Ry. Express Agency, Inc., 321 U.S. 342, 348-49 (1944).

We begin with the basics. Section 1983 claims are subject to New York's residual three-year statute of limitations. <u>Walters v. City Dep't of Corr.</u>, 517 F. App'x 41, 42 (2d Cir. 2013). While state law provides the limitations period, federal law "governs the question of when a federal claim accrues."[14] <u>M.D. v. Southington Bd. of Educ.</u>, 334 F.3d 217, 221 (2d Cir. 2003). As with all other questions at the summary judgment stage, "[i]f any issue of genuine material fact regarding . . . claim accrual exists, it must be reserved for trial." <u>Singh v. Wells</u>, 445 F. App'x 373, 376 (2d Cir. 2011).

Under the prevailing law of this Circuit, § 1983 claims generally accrue "when the plaintiff knows or has reason to know of the injury which is the basis of his action."[15] <u>Hogan v. Fischer</u>, 738 F.3d 509, 518 (2d Cir. 2013) (quoting <u>Pearl v. City of Long Beach</u>, 296 F.3d 76, 80 (2d Cir. 2002)); <u>see also</u> <u>Walters</u>, 517 F. App'x at 42. The City takes the position that the plaintiffs' claims accrued in the 1980s and 1990s, when they learned of the deaths of their loved ones, and are thus time barred. The plaintiffs, on the other hand, argue that the Court should fix the accrual date using the "diligence-discovery rule," according to which a claim accrues only

---

[14] State law, however, governs whether or not the limitations period is tolled. <u>See</u> <u>Pearl v. City of Long Beach</u>, 296 F.3d 76, 80 (2d Cir. 2002); <u>but see</u> <u>id.</u> (describing taxonomic confusion between tolling and accrual).

[15] Though the parties agree that this is the general rule, <u>see</u> City Br. at 7; Pls. Opp. at 71, its continued viability is open to question. In <u>Wallace v. Kato</u>, 549 U.S. 384 (2007), the Supreme Court held that § 1983 claims are governed by "the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief," <u>id.</u> at 388 (internal quotation and punctuation marks omitted). In <u>Gabelli v. SEC</u>, 133 S. Ct. 1216 (2013), a case that had nothing to do with § 1983, the Supreme Court quoted the <u>Wallace</u> language for the proposition that claims normally accrue at the time of the injury, rather than its discovery, <u>id.</u> at 1221-22. Yet following <u>Gabelli</u>, the Second Circuit continued to hold that § 1983 claims accrue upon discovery of the injury rather than occurrence of the injury. <u>See, e.g.</u>, <u>Hogan</u>, 738 F.3d at 518; <u>Walters</u>, 517 F. App'x at 42. We note the apparent tension between <u>Wallace</u>, <u>Gabelli</u>, and Second Circuit § 1983 precedent only for purposes of transparency, and to illustrate the complexities and ambiguities of accrual doctrine. That tension does not affect the holding here because, as explained below, the accrual of these claims is governed by the diligence-discovery rule.

when "the plaintiff has or with reasonable diligence should have discovered the critical facts of both his injury **and its cause**." Kronisch v. United States, 150 F.3d 112, 121 (2d Cir. 1998) (emphasis added).[16] The plaintiffs thus contend that their claims against the City did not accrue until they had some reason to link the NYPD to the murders.

The diligence-discovery rule applies in cases where "the government conceals the acts giving rise to the plaintiff's claim, or where [the] plaintiff would reasonably have had difficulty discerning the fact or cause of the injury at the time it was inflicted." Kronisch, 150 F.3d at 121; see also Gilvar v. United States, 468 F. App'x 31, 32 (2d Cir. 2012). The rule was developed in the context of Federal Tort Claims Act ("FTCA") cases, but has since been employed in a range of circumstances. See Twersky, 2014 WL 4358415, at *1-2 (Title IX claim against school authorities who failed to act on allegations of abuse); A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 140 (2d Cir. 2011) (FTCA medical malpractice claim); Kronisch, 150 F.3d at 121 (FTCA and Bivens claims related to CIA drug experiments on unwitting victims); Barrett v. United States, 689 F.2d 324, 333 (2d Cir. 1982) (FTCA and § 1983 claims brought by relatives of a state hospital patient who was unwittingly subjected to military chemical weapons experiments); see also Veal v. Geraci, 23 F.3d 722, 724 (2d Cir. 1994) (describing Barrett as

---

[16]     We pause to address an issue of terminology. In a recent opinion, the Second Circuit referred to the Kronisch method of fixing accrual as the "discovery accrual rule," rather than the "diligence-discovery rule." See Twersky v. Yeshiva Univ., --- F. App'x ----, 2014 WL 4358415, at *1 (2d Cir. Sept. 5, 2014). The use of this term carries some potential for confusion because the doctrine that a claim accrues "when a plaintiff knew or should have known of his injury" (rather than its cause) is itself sometimes described as the "discovery accrual rule" or the "discovery rule." See, e.g., Rotella v. Wood, 528 U.S. 549, 553, 555 (2000); Pearl, 296 F.3d at 80. For purposes of clarity, in this opinion the Court uses the term "diligence-discovery rule" to refer to the doctrine that a claim does not accrue until the plaintiff knows or has reason to know the "critical facts" of both the injury and its cause.
Claim

standing for the proposition that a "§ 1983 claim accrues only after [the] claimant knows or has reason to know of both the harm and the cause of the harm").[17]

Cases involving rogue government employees are particularly instructive. In Gilvar, the Second Circuit applied the diligence-discovery rule to FTCA claims brought by plaintiffs who sought to hold the government responsible for domestic terrorist attacks carried out by a disaffected government scientist using U.S. military anthrax. See Gilvar, 468 F. App'x at 32. And in a series of recent FTCA cases that resemble these cases in key aspects, the First Circuit used the diligence-discovery rule to determine the accrual date of claims brought by the families of victims who were murdered in the 1980s by Boston-area gangster Whitey Bulger based on information leaked to him by a corrupt FBI agent. See, e.g., Litif v. United States, 670 F.3d 39 (1st Cir. 2012); Donahue v. United States, 634 F.3d 615 (1st Cir. 2011); McIntyre v. United States, 367 F.3d 38 (1st Cir. 2004). Given the similarities between the circumstances here and the Gilvar and Whitey Bulger cases, the Court employs the diligence-discovery rule to measure the accrual of the plaintiffs' § 1983 claims.[18]

---

[17]     The City cites a number of cases for the proposition that § 1983 accrual is governed strictly by the discovery of the injury, but unlike the plaintiffs here, the plaintiffs in those cases were aware at the time of their injuries that the injuries were potentially attributable to the defendant municipalities (or at least to municipal employees). See, e.g., Lawson v. Rochester City Sch. Dist., 446 F. App'x 327, 328-29 (2d Cir. 2011) (claim accrued when plaintiff was fired by the school district, not when he later discovered additional facts about why he was fired); Pearl, 296 F.3d at 84-85 (claim accrued when plaintiff was beaten by the police, not when he later found evidence that the officers lied about the beating in testimony given in his previous civil lawsuit); Paige v. Police Dep't of City of Schenectady, 264 F.3d 197, 199-200 (2d Cir. 2001) (claim accrued when the plaintiff was sexually assaulted by uniformed police officer, not when she later learned that the department failed to investigate her allegations).

[18]     The City contends that the diligence-discovery rule applies only to the narrow subsection of cases in which "the government concealed the injury deliberately and the plaintiff remained blamelessly ignorant of his claim." Cullen v. City of New York, No. 07-cv-3644, 2010 WL 6560742, at *8 (E.D.N.Y. July 13, 2010) (Azrack, Mag. J.) (internal quotation marks omitted), adopted, 2011 WL 1578581 (E.D.N.Y. Apr. 26, 2011) (Amon, J.). But Cullen cites Kronisch

In so concluding, we are mindful of "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." <u>Gabelli</u>, 133 S. Ct. at 1221 (quoting <u>Rotella</u>, 528 U.S. at 555). Statutes of limitations, of course, also guard against "the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." <u>Gabelli</u>, 133 S. Ct. at 1221 (quoting <u>R.R. Telegraphers</u>, 321 U.S. at 348-49). The diligence-discovery rule strikes an appropriate balance between accountability and repose: it "protects plaintiffs who are . . . struggling to uncover the underlying cause of their injuries from having their claims time-barred before they could reasonably be expected to bring suit; [and] at the same time, [it] avoids unduly extending the limitations period for those who could have timely presented their claim . . . had they acted diligently in protecting their interests." <u>A.Q.C.</u>, 656 F.3d at 140.

We now apply the rule. The City takes the position that the claims are untimely, even under the diligence-discovery rule, because press coverage in the mid-1990s put the plaintiffs on inquiry notice of the NYPD's possible involvement in the murders.[19] It also argues that the subjective suspicions of several plaintiffs that unidentified police officers may have played a role in the murders were sufficient to trigger accrual, or at least a duty to investigate that went unfulfilled.

---

(among other cases) for this proposition, and <u>Kronisch</u>'s formulation of the rule is not so narrow. <u>See</u> <u>Kronisch</u>, 150 F.3d at 121. And even assuming, arguendo, that the City's restrictive construction of the diligence-discovery rule is correct, there is no question that Eppolito and Caracappa acted in secrecy, much like the rogue government employees in <u>Gilvar</u> and the Whitey Bulger cases.

[19] The City does not contest the timeliness of the <u>Greenwald</u> claims under the diligence-discovery rule. City Reply at 8 n.6.

"Discovery of the 'critical facts' of injury and causation is not an exacting requirement." Kronisch, 150 F.3d at 121; see also A.Q.C., 656 F.3d at 140. The "plaintiff need not know each and every relevant fact of his injury or even that the injury implicates a cognizable legal claim. Rather, a claim will accrue when the plaintiff knows, or should know, enough of the critical facts of injury and causation to protect himself by seeking legal advice." Kronisch, 150 F.3d at 121 (quoting Guccione v. United States, 670 F. Supp. 527, 536 (S.D.N.Y. 1987) (Motley, J.)). While "[a] claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, . . . such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." Kronisch, 150 F.3d at 121 (citing Hobson v. Wilson, 737 F.2d 1, 35 (D.C. Cir. 1984)). News reports, if sufficiently probative and widely publicized, can trigger accrual, or at least require potential plaintiffs to undertake a reasonably diligent investigation. Donahue, 634 F.3d at 625-27; see also Gilvar, 468 F. App'x at 32-33; McIntyre, 367 F.3d at 59.

"Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." McIntyre, 367 F.3d at 52 (citing Skwira v. United States, 344 F.3d 64, 77 (1st Cir. 2003)). To determine whether the claim has accrued after the duty to inquire has been triggered, courts ask "whether the plaintiff, if armed with the results of that investigation, would know enough to permit a reasonable person to believe . . . that there is a casual connection between the [defendant] and her injury." McIntyre, 367 F.3d at 52. The inquiry is not limited to the plaintiff's subjective knowledge; it examines "not only what was actually known but what a reasonable person, once fairly prompted to investigate, would have discovered by diligent investigation." Litif, 670 F.3d at 44.

The analysis is straightforward for the Di Lapi, Pipitone (Guido), and Boriello cases. The news reports in the record attributed the murders in these cases to Casso and the Luccheses, and some of the reports that mentioned Guido's murder also described Casso's suspected connection with Eppolito and Caracappa. See Ex. HHHH. But because there was no indication that Di Lapi, Guido, or Boriello were killed because they were cooperating with the police, there was no reason for their relatives to speculate that the NYPD detectives provided Casso with law enforcement information or used NYPD equipment to facilitate the murders. There was thus no basis in the newspaper articles for the Di Lapi, Pipitone (Guido), or Boriello plaintiffs to suspect that there might be a causal connection between the City and the murders or that they should protect themselves against that eventuality by seeking legal advice. Accordingly, the Di Lapi, Pipitone, and Boriello claims did not accrue until Eppolito and Caracappa were indicted in March 2005.

The analysis differs slightly for the Bishop and Morris (Heindel) cases, because news accounts suggested that the Luccheses murdered Bishop and Heindel for cooperating with the police. One 1992 article in the Dallas Morning News specifically reported that Bishop's cooperation had been revealed to the Luccheses by their "crystal ball" source in law enforcement. But even assuming that Bishop and Heindel's relatives were on notice of the information contained in these articles (or should have been), that information would at most have triggered a duty to inquire into the existence of a claim. See Kronisch, 150 F.3d at 121. The post-1994 articles that describe Caracappa and Eppolito's relationship with Casso do not mention the Heindel and Bishop murders. There is little in the record to suggest that any investigation conducted by the plaintiffs could have uncovered evidence of a causal link between

the murders and the NYPD. At best, the nature of the results of a diligent investigation is a factual question for the jury. See id. at 124-25.

The Lino case, however, presents a closer issue. Several 1994 news reports, including front-page articles, indicated that Casso told federal investigators that Eppolito and Caracappa killed Lino. Plaintiff Anna Lino, who was Lino's wife, disclaims any awareness of the articles. These circumstances are best analyzed by analogy to those considered by the First and Second Circuits in three recent decisions. In Litif, two front page articles in major newspapers and "a few other isolated press mentions" reported that the decedent had been murdered after the FBI leaked his identity to Bulger. 670 F.3d at 45. The First Circuit concluded that the plaintiffs, who denied knowledge of the news coverage, could not be charged with knowledge of the articles as a matter of law. Id. Nor, given the circumstances surrounding the articles, including the potential unreliability of the sources and the FBI's public refutations, could the plaintiffs have relied on the articles or learned sufficient information, even after a diligent investigation, to have established a causal link between the FBI and the murder. Id.

Donahue, like Litif, involved the murder of an informant whose identity was leaked to Bulger by the FBI. Again there was no proof that the plaintiffs were subjectively aware of the numerous newspaper reports linking the FBI to the murder. The First Circuit held, however, that the claim accrued, at the latest, after newspapers reported that one of Bulger's associates had confirmed the prior testimony of an FBI agent—which itself had been widely reported several months earlier—that that the FBI had informed Bulger of the informant's identity shortly before his death. Donahue, 634 F.3d at 625-27. In holding that the plaintiffs were on notice of the link between the FBI and the murder, the First Circuit cited thirty-six articles that had been published

in major Boston newspapers over the prior two years, ten of which were on the front page. Id.; see also id. at 630-31 (listing newspaper articles).

The Gilvar case stemmed from a domestic terrorism campaign in late 2001 in which anthrax was mailed to media and political organizations. Within weeks of the attacks, the media reported that the anthrax had been developed in a U.S. military lab. Gilvar v. United States, No. 09-cv-8941, 2011 WL 2161866, at *1-4 (S.D.N.Y. May 26, 2011) (Swain, J.) ("Gilvar II"). The attacks and the provenance of the anthrax received massive media attention, of which the plaintiffs were apparently aware. By mid-2002, at least eight prominent news reports had conclusively identified the U.S. military as the source of the anthrax, and by 2005, four other victims had filed administrative claims. Id. The Gilvar plaintiffs did not file suit until early 2009, shortly after the FBI publicly concluded that a government scientist had been responsible for the attacks. Id. The district court held that, "[i]n light of the extensive media coverage," the claims had accrued prior to 2007 and were thus untimely. Id. at *4; see also Gilvar, 468 F. App'x at 33 (affirming district court).

While the publicity surrounding Casso's accusation that Eppolito and Caracappa murdered Lino might—at least arguably—have exceeded the publicity in Litif, it falls well short of the level of publicity that triggered accrual in Gilvar and Donahue. Under these circumstances, the Court cannot conclude, as a matter of law, that the publicity surrounding Casso's 1994 statements was sufficiently pervasive to charge knowledge to the plaintiff. That is a factual question appropriate for resolution by jury.

Finally, the City contends that the deposition testimony of the Di Lapi, Morris (Heindel), and Boriello plaintiffs indicates that they were actually aware that the NYPD was involved in the murders. These plaintiffs testified, in essence, that they suspected that crooked cops were

involved in the murders of their respective family members. Subjective knowledge of the grounds for a claim can, of course, trigger accrual. See, e.g., Litif, 670 F.3d at 44 n.3. But it does not appear that the plaintiffs' generalized, inchoate suspicions were related to the actual conspiracy between Eppolito and Caracappa and the Luccheses. And, as discussed above, it is questionable—at the least—whether any diligent investigation of these vague suspicions would have turned up any solid grounds to believe that the NYPD was causally linked to the murders. The extent to which the Di Lapi, Morris, and Boriello plaintiffs were subjectively aware of the connection between the deaths of their family members and Eppolito, Caracappa, and the NYPD thus presents a factual question. Accordingly, the Court cannot conclude as a matter of law that these claims are untimely.

2. Municipal Liability

The Court now turns to the substance of the Monell claim. In order to hold a municipality liable under § 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Simms v. City of New York, 480 F. App'x 627, 629 (2d Cir. 2012) (internal quotation marks omitted); see generally Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Where plaintiffs seek to hold a municipality liable under a theory of failure to supervise or discipline, as in these cases, they must also show that the municipal policymaker acted with deliberate indifference. City of Canton v. Harris, 489 U.S. 378, 388-89 (1989).

The plaintiffs proceed under two theories. The first is that Ward was deliberately indifferent to the obvious red flags surrounding the flawed disciplinary process when he decided to clear Eppolito of the Gambino charges and to allow him to remain on the force. The second is

that Ward and other high-ranking NYPD officials encouraged (or were deliberately indifferent to) the entrenched practice of tolerating corruption to avoid bad press described in the Mollen Report, and that this practice was the moving force behind the otherwise inexplicable failure to discipline Eppolito.  Both theories presume that the failure to discipline Eppolito in 1985 caused the ensuing murders.

(a)    <u>Official Policy or Custom</u>

The first question is whether the plaintiffs can establish an official policy or custom. They point to two: (1) the NYPD custom and practice of failing to appropriately discipline and supervise officers, as described by the Mollen Commission, by tolerating corruption to preserve the NYPD's reputation; and (2) Commissioner Ward's 1985 decision to clear Eppolito of the Gambino charges and restore him to duty.

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." <u>Cash v. Cnty. of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011).  A custom or practice of failing to properly discipline or supervise police officers will amount to a municipal policy if it was so persistent, manifest, and widespread that the City policymaker constructively acquiesced to it.  <u>Sorlucco v. New York City Police Dep't</u>, 971 F.2d 864, 870-71 (2d Cir. 1992); <u>see also</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988); City Br. at 39.  Here, the Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity.  It characterizes this custom as persistent, widespread, and emanating "from top commanders, including the police commissioner."  P ¶ 191.  The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for <u>Monell</u> purposes and that the City's handling of the Eppolito matter was

reflective of that policy.  See White-Ruiz v. City of New York, No. 93-cv-7233, 1996 WL

603983, at *8-10 (S.D.N.Y. Oct. 22, 1996) (Dolinger, Mag. J.) (Mollen Report provided

evidence of municipal policy of NYPD code of silence); Ariza v. City of New York, No. 93-cv-

5287, 1996 WL 118535, at *5 (E.D.N.Y. Mar. 7, 1996) (Sifton, J.) (same); see also Gentile v.

Cnty. of Suffolk, 926 F.2d 142, 153 (2d Cir. 1991) (report describing police practice of tolerating

misbehavior was evidence of municipal policy for Monell purposes).

The single action or inaction of a municipal policymaker, such as a specific failure to

adequately supervise or discipline an officer, can also form an official policy or custom

attributable to a municipality for purposes of municipal liability.  Amnesty America v. Town of

W. Hartford, 361 F.3d 113, 125-26 (2d Cir. 2004); see also Pembaur v. City of Cincinnati, 475

U.S. 469, 480-81 (1986); City Br. at 38-39.  At the culmination of the 1985 disciplinary process,

Commissioner Ward himself approved Mo's recommendation and chose not to discipline

Eppolito.  Because Ward was the NYPD policymaker for disciplinary purposes, that act is

sufficient to bind the City.  The fact that Ward was acting on Mo's recommendation is beside the

point, because "§ 1983 plaintiffs may establish that the city is liable for their injuries by proving

that 'the authorized policymakers approved a subordinate's decision and the basis for it.'"

Amnesty America, 361 F.3d at 126 (internal alteration omitted) (quoting Prapotnik, 485 U.S. at

127).  Indeed, Ward was obligated to review the recommendation and decide for himself the

appropriate disciplinary outcome.

(b)      Deliberate Indifference

Having established that the record is sufficient to show municipal policy, the Court turns

to the element of deliberate indifference.  "[D]eliberate indifference is a stringent standard of

fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). "The means of establishing deliberate indifference will vary given the facts of the case and need not rely on any particular factual showing," but "[t]he operative inquiry is whether the facts suggest that the policymaker's inaction was the result of a conscious choice rather than mere negligence." Amnesty America, 361 F.3d at 128 (internal quotation marks omitted). In other words, plaintiffs must establish "that a policymaking official had notice of a potentially serious problem of unconstitutional conduct, such that the need for corrective action was obvious, and the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." Id. (internal quotation marks and citation omitted).

With respect to the 1985 failure to discipline Eppolito, the City argues that the record will not support the inference that Commissioner Ward was deliberately indifferent. Contrary to the City's contention, however, a single disciplinary failure can support an inference of deliberate indifference. Amnesty America, 361 F.3d at 127. In Amnesty America, a police chief was present at two protests at which his officers allegedly assaulted protestors. 361 F.3d at 127-29. The Second Circuit held that the jury could infer, from the chief's presence on the scene, that in each instance he was aware of the assaults but took no action to resolve them, and thus was deliberately indifferent. Id.

The City seeks to distinguish Amnesty America by noting that the police chief in that case observed his officers commit constitutional violations, whereas in this case Commissioner Ward was aware only that Eppolito allegedly leaked confidential police documents to a well-known mobster, which is not in itself a constitutional violation. Deliberate indifference, however, does not require inaction in the face of a constitutional violation; inaction in the face of

a serious and obvious *risk* of constitutional harm is sufficient.  See Jones v. E. Haven, 691 F.3d 72, 81 (2d Cir. 2012); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995).  The failure to discipline a detective who colludes with organized crime plainly courts the risk that that detective will do so again.  And it is likewise obvious that collusion between a police detective and organized crime might well lead, as it did in these cases, to unconstitutional harm to members of the public.

The City also argues that Commissioner Ward lacked sufficient notice that the disciplinary process was deficient or that Eppolito actually leaked the documents.  The record suggests otherwise.  The charges against Eppolito were serious and unusual.  Ward was almost certainly aware of the allegations before he was called upon to review Mo's recommendation, particularly given the attention that they had received in the press.  And the evidence that provided the basis for the charges—that Eppolito's fingerprints were lifted from confidential police documents in Gambino's possession—was highly provocative.  These factors suggest that the case received, or should have received, Ward's full attention.

Against that background, a reasonable jury might well find Ward's response curious and very troubling.  Both the hearing transcript and Mo's memorandum made clear that the hearing was conducted on stipulations by a junior lawyer without a second chair.  The transcript also revealed that the Advocate's Office lawyer did not make a closing argument.  Ward had access to all of the stipulations and documents that were considered as evidence, including the GO 15 transcript.  As an attorney with extensive disciplinary experience, having served both as a departmental advocate and as a trial commissioner, Ward was well-positioned to appreciate the

hearing's unusual nature and the contradictions between the stipulated evidence and Eppolito's GO 15 statements. He nonetheless approved Mo's recommendation within one day.[20]

Having concluded that Eppolito should not be disciplined, Ward apparently did not order any additional investigation or follow-up to determine how the intelligence documents were leaked to Gambino. And after Eppolito was reinstated, someone in Ward's office ordered Chief Nicastro to take Eppolito back into the detective bureau over Nicastro's objections. Under these circumstances, a reasonable jury could conclude that Ward was aware of significant red flags and consciously chose to ignore them, and thus that his decision to reinstate Eppolito was the product of deliberate indifference rather than mere negligence or bureaucratic inaction.

The Mollen Commission report provides an additional basis to find deliberate indifference at the highest levels of the NYPD. It describes a conscious desire among the "top brass" of the NYPD, including Commissioner Ward, to avoid disclosing corruption or disciplining corrupt officers in order to protect the NYPD's reputation. Based on the report, a jury could reasonably conclude that Ward and other high-level officials were deliberately indifferent to this widespread and persistent practice of tolerating police corruption.

In sum, the flawed 1985 disciplinary process and the attitudes and practices described in the Mollen Commission report provide separate grounds upon which a jury might find deliberate indifference. They also reinforce each other. The failure to discipline Eppolito in 1985 can be

---

[20] According to Walsh, Ward (like Mo) had an obligation to review the hearing and GO 15 transcripts before making the final disciplinary decision. P ¶ 144. The Appellate Division has held, as the City notes, that "the Commissioner is not required to read the transcript of the hearings" before approving or disproving the recommendation of the Trial Commissioner. Kelly v. Monaghan, 191 N.Y.S.2d 632, 634 (App. Div. 1st Dep't 1959). But Kelly also makes clear that the Commissioner must make an "informed decision" and may not blindly follow his subordinate's recommendation. Id. In Kelly, "the absence of [the hearing transcript] and the short interval of time (the same day) which elapsed" rebutted the presumption that the Commissioner had in fact made an informed decision. Id. at 95.

viewed as evidence of the systemic failure to address corruption that was described in the Mollen Report. And in turn, the Mollen Report suggests a motive for why Ward failed to take action against Eppolito in 1985—his desire to avoid bad press—and thus might also be viewed as evidence of deliberate indifference with respect to that specific disciplinary decision.

(c)     Causation

The final issue is causation. Municipalities can only be held liable under § 1983 when they are a "moving force" behind the constitutional deprivation. Kentucky v. Graham, 473 U.S. 159, 166 (1985). Because there is no respondeat superior liability for § 1983 claims, the plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bd. of Cnty. Comm'rs of Bryan Cnty., 520 U.S. at 404; see also Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000).

Despite the high level of causation required for municipal liability, "[t]he Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983." Warner v. Orange Cnty. Dept. of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997). Accordingly, the Second Circuit has equated the "moving force" principle to the general tort law concept of "proximate cause." Cash, 654 F.3d at 341-42 (finding no abuse of discretion because trial court's "proximate cause" instruction "fairly describe[d] a plaintiff's causation burden with respect to a municipal liability claim"). Like other tort defendants, municipalities are "responsible for the natural consequences of their actions" when sued under § 1983. Warner, 115 F.3d at 1071.

The plaintiffs primarily contend that the murders would not have happened if Eppolito had been disciplined—presumably terminated from the force, and perhaps prosecuted—in 1985. In response, the City argues Eppolito could have participated in the murder plots even if he had

been fired and that the police information and equipment used to facilitate the murders was, or could have been, obtained by Caracappa.

Before reaching that issue, however, the Court first addresses whether a jury could find that the attitudes and practices described in the Mollen Report were a motivating force behind the failure of the 1985 disciplinary process. The City characterizes the Mollen Report as focused on problems with the Internal Affairs investigative process, rather than problems with the hearing process. For that reason, the City argues, the practices described by the Mollen Commission could not have caused the abortive 1985 hearing.

This view slices the Commission's findings too narrowly. While the Report describes lapses at the precinct level and within Internal Affairs, it also concludes that "a message had filtered down from top commanders, including the police commissioner, that disclosure of corruption, even that resulting from vigilant corruption fighting, would be viewed as a management failure." P ¶ 191. There is no plausible reason why the consequences of such a message would have been restricted to the Internal Affairs component of the disciplinary process. And Mo's laudatory statements to the press shortly after Eppolito was cleared of the Gambino charges—statements that the plaintiffs contend violated NYPD policy—might be viewed as evidence that the outcome of the disciplinary process was motivated by concerns about the NYPD's public perception. These cases are thus comparable to those in which courts have looked to the Mollen Report as evidence of municipal liability, rather than those in which courts held that the Commission's conclusions were too attenuated from the challenged constitutional violations. Compare, e.g., Barry v. New York City Police Dep't, No. 01-cv-10627, 2004 WL 758299, at *13 (S.D.N.Y. Apr. 7, 2004) (Motley, J.) (Mollen Report probative where officer alleged retaliation after reporting corruption) with, e.g., Domenech v. City of New

<u>York</u>, 919 F. Supp. 702, 711 (S.D.N.Y. 1996) (Sweet, J.) (Mollen Report not probative where officer alleged retaliation after reporting sexual harassment). Under these circumstances, a reasonable jury might well conclude that Eppolito's acquittal on the 1985 disciplinary charges was attributable to the department-wide focus on avoiding bad press, even at the expense of tolerating corruption, that was described by the Mollen Commission.

We now address whether the murders were the natural consequences of the NYPD's 1985 failure to discipline Eppolito. The answer is clear-cut in the <u>Pipitone</u> and <u>Greenwald</u> matters. Less than a year after Eppolito was cleared, in February 1986, he and Caracappa used a police car to pull over and murder Greenwald. Several months later, in September 1986, Eppolito was assigned to the investigation of the 1986 hit attempt on Casso. Based on information received from Eppolito, Casso murdered Nicky Guido, a man who had the bad fortune to share the same name as one of Casso's would-be assassins. In both cases, a reasonable jury could infer that Eppolito used his police authority to facilitate the murders and would not have been in a position to do so if he had been terminated. While the City contends that Caracappa could and would have leaked Guido's name to Casso and supplied the police car used to murder Greenwald even if Eppolito had been fired in 1985, those are questions for the jury, not suitable for summary judgment.

The causation analysis in the <u>Morris</u> case leads to a similar result. There, Eppolito also used his position as a detective to help facilitate Heindel's murder. It was most likely Caracappa, rather than Eppolito, who used police sources to determine that Heindel was cooperating with the FBI. Nonetheless, after the murder, Eppolito was assigned to the investigation and located cassette tapes in Heindel's apartment that confirmed that Heindel had, in fact, been working with the FBI. A jury could conclude that Eppolito's role in the murder investigation was an integral

part of the plot, and thus that the failure to terminate Eppolito was a "moving force" behind Heindel's murder.

The question of causation is more complex in the Di Lapi, Bishop, Lino, and Boriello cases because Eppolito had retired from the police force by the time of those murders.[21]  After his retirement, Eppolito apparently lacked access to law enforcement information or vehicles other than through Caracappa, who continued to serve on the Major Case Squad.  The record does not suggest that there was a culpable failure to discipline or supervise Caracappa.  Thus the question is whether the 1985 failure to discipline Eppolito can be viewed as a "moving force" behind Caracappa's actions.

The Court finds that it can.  A reasonable jury might conclude that the gross failure to discipline Eppolito in 1985 emboldened Caracappa to collude with Kaplan and Casso.  The Second Circuit relied on a similar theory of causation in Vann.  72 F.3d at 1049-51.  In that case, the City was held liable for an officer's violent assault on a civilian because the NYPD had failed to appropriately supervise and discipline the officer, who had previously assaulted civilians and demonstrated an inability to control his aggression.  Id.  The Second Circuit concluded that the NYPD's decision to reinstate the officer and its indifference to subsequent civilian complaints "empowered" the officer, even though he was off-duty at the time of the assault, and "caused him to feel entitled . . . to compel the 'respect' he demanded through the use of violence."  Id. at 1051.

---

[21]    At some unspecified point in time, Eppolito apparently gave Kaplan a tape recording of Boriello discussing the 1986 hit attempt on Casso.  Ex. NNN at 757.  Though neither party briefed the issue, it appears to the Court that a reasonable jury could conclude, based on Kaplan's trial testimony, that Eppolito obtained this tape recording using his authority as a police officer and that the recording caused Casso to target Boriello for retribution.  Under those circumstances, Monell causation would be a more straightforward issue, akin to that discussed above in the Pipitone case.

The City attempts to distinguish <u>Vann</u> by pointing out that the emboldened officer in that case was the same officer who had been insufficiently disciplined. That is an accurate reading of <u>Vann</u>, but the emboldening theory nonetheless fits the circumstances of this case. It is plainly foreseeable that the failure to discipline an officer who has been caught red-handed might embolden that officer's close associates and colleagues to engage in similar misconduct. <u>See</u> <u>Gentile</u>, at 926 F.2d at 152-53 (upholding jury's conclusion that police misbehavior was caused by a departmental custom of tolerating misconduct). The City contends that there is no evidence that Caracappa's cooperation with the mob was prompted or encouraged by the City's failure to discipline Eppolito in 1985. Yet there is no evidence that Caracappa had any criminal relationship with the mob before Eppolito was cleared. And Caracappa was well aware of the 1985 charges against Eppolito. Given the close relationship between the two men and their subsequent partnership in criminal misdeeds, it would be reasonable for a jury to infer that Caracappa was emboldened by Eppolito's escape or, conversely, that Caracappa would have been deterred from criminal activity had Eppolito been disciplined.

Indeed, the City concedes that Caracappa might have been deterred if Eppolito had been criminally prosecuted and jailed in 1985. City Reply at 45. Criminal prosecution would almost certainly have had a stronger deterrent effect than NYPD disciplinary sanction, but the difference in the level of deterrence is a matter of degree that is not susceptible to resolution at the summary judgment stage. And even taking the City's argument at face value, it is at least possible, and perhaps likely, that Eppolito would have been criminally prosecuted if the 1985 disciplinary charges had been substantiated. While the OSSP decided not to seek criminal charges at the outset of the Internal Affairs investigation, and the immunity that Eppolito received for his GO 15 testimony might have complicated a subsequent prosecution, the strength of the fingerprint

evidence suggests that a criminal prosecution would have been a viable option if the disciplinary charges had been sustained.

B.    State Claims

The Court now turns to the plaintiffs' state law claims, the timeliness of which is put in issue by the summary judgment motions of both the City and the Di Lapi plaintiffs. While federal law governs the accrual of the plaintiffs' § 1983 claims, New York law controls the accrual of their state law claims.[22] New York employs the injury accrual rule, according to which claims accrue at the moment that the plaintiff is injured, rather than the date she discovers her injury. See, e.g., Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993); Gen. Stencils, Inc. v. Chiappa, 18 N.Y.2d 125, 127 (1966). It was on this basis that the Court previously denied the Greenwald plaintiffs' motion to strike the City's affirmative statute of limitations defense. See Greenwald v. City of New York, No. 06-cv-2864, 2012 WL 6962297, at *3, 7-8 (E.D.N.Y. July 19, 2012) (Azrack, Mag. J.), adopted, 2013 WL 354169 (E.D.N.Y. Jan. 29, 2013) (Dearie, J.).

New York state courts have already held that the state law claims brought by the Morris and Pipitone plaintiffs are time-barred. See Pipitone v. City of New York, 832 N.Y.S.2d 230, 232 (App. Div. 2d Dep't 2007); Morris v. City of New York, 847 N.Y.S.2d 903, 2007 WL 2376810, at *2-4 (N.Y. Sup. Ct. 2007). Those plaintiffs apparently concede that their state law claims are precluded by these decisions. See Pls. Opp. at 90, n.45; see also Univ. of Tenn. v.

---

[22]    The state law claims are governed by a different statute of limitations than the federal claims, though both limitations periods are derived from New York law. Plaintiffs asserting state law tort claims against municipalities, or municipal employees acting within the scope of employment, must (1) file a notice of claim within 90 days after the cause of action accrues and (2) commence a lawsuit within a year and 90 days from the date that the cause of action accrues. N.Y. Gen. Mun. L. §§ 50-e, 50-i. In wrongful death actions, the 90-day notice period runs from the appointment of a representative of the decedent's estate and the lawsuit must be commenced within two years of the death. Id.

Elliott, 478 U.S. 788, 796 (1986) (state court judgments have preclusive effect in subsequent § 1983 lawsuits).

The remaining plaintiffs argue, however, that their claims against the City are timely because the limitations period was tolled by CPLR § 215(8) and Est. Powers and Trusts Law ("EPTL") § 5-4.1. These provisions apply, respectively, to state law tort and wrongful death claims in which "a criminal action against the same defendant has been commenced with respect to the [same] event or occurrence" that gave rise to the claim. Id. They extend the limitations period for civil suits for at least one year beyond the termination of the criminal action. Id.

The parties dispute whether the phrase "same defendant" covers the uncharged employer of a criminal defendant. They cite divergent precedent from the Appellate Division. The plaintiffs rely on the First Department's decision in Alford v. St. Nicholas Holding Corp. for the proposition that CPLR § 215(8) "applies to extend the Statute of Limitations against the employer as well as the wrongdoer." 631 N.Y.S.2d 30, 31 (App. Div. 1st Dep't 1995). In reaching this conclusion, the Alford court reasoned that the statute's purpose of relieving "the criminal victim of the burden of participating simultaneously in two separate legal proceedings based on separate facts" would be served, in cases of vicarious liability, by reading "same defendant" broadly to subsume the defendant's employer. Id.

The defendants, on the other hand, cite a series of cases, including Pipitone, in which Appellate Division panels in the Second and Fourth Departments have ruled that CPLR § 215(8) and EPTL § 5-4.1 do not toll the statute of limitations against the uncharged employers of criminal defendants. See Pipitone, 832 N.Y.S.2d at 232; Villanueva v. Comparetto, 580 N.Y.S.2d 30, 32 (App. Div. 2d Dep't 1992) (interpreting CPLR § 215(8)); Jordan v. Britton, 515

N.Y.S.2d 678, 681 (App. Div. 4th Dep't 1987) (interpreting EPTL § 5-4.1); <u>see also</u> <u>Morris</u>, 2007 WL 2376810, at *2-4.

The Fourth Department's logic in <u>Jordan</u> is persuasive.[23]  The purposes of the tolling statues, which <u>Jordan</u> describes as inter alia "unburden[ing] the [plaintiff] from participating in two totally separate legal proceedings based on almost identical facts" and "enabl[ing] the [plaintiff] to use the criminal judgment of conviction as proof of facts asserted in civil court," might well be furthered by extending their application to the employers sued under a theory of vicarious liability.  515 N.Y.S.2d at 680.  Nonetheless, the meaning of the phrase "same defendant" is plain and unambiguous, and as such is not subject to judicial expansion to serve perceived policy goals.  <u>See</u> <u>id.</u> at 681; <u>see also</u> <u>Commonwealth of N. Mariana Islands v. Canadian Imperial Bank of Commerce</u>, 21 N.Y.3d 55, 60 (2013) ("Where the statutory language is clear and unambiguous, the court should construe it so as to give effect to the plain meaning of the words used.") (internal quotation marks omitted).  Moreover, to the extent that the plaintiffs in these related lawsuits raise the same questions of law, they ought to receive the same answers.  Thus concerns of comity and fairness also counsel in favor of reading CPLR § 215(8) and EPTL § 5-4.1 in the same manner as the state courts in <u>Morris</u> and <u>Pipitone</u>.

Because the City was not a defendant in any criminal action related to these cases, CPLR § 215(8) and EPTL § 5-4.1 do not apply to the plaintiffs' state law claims.  Those claims are thus untimely.  This conclusion is fatal to the <u>Di Lapi</u> plaintiffs' motion for summary judgment.

---

[23]    Though this Court is situated within the geographic purview of the Second Department, it is not constrained to follow that court's precedent, but rather must apply state law in the manner in which it would be applied by the Court of Appeals.  <u>See</u> <u>Michalski v. Home Depot, Inc.</u>, 225 F.3d 113, 116-17 (2d Cir. 2000).

CONCLUSION

For the reasons stated above, the <u>Di Lapi</u> plaintiffs' motion for summary judgment is

DENIED.  The City's motion for summary is judgment is GRANTED as to the state law claims

and DENIED as to the federal claims.


SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2014

                                       /s/ Judge Raymond J. Dearie
                                     _____
                                     RAYMOND J. DEARIE
                                     United States District Judge